(57 P.3d 825)

No. 87,130

STATE OF KANSAS, *Appellee*, v. BILLY W. CARTER, II, *Appellant*.

Opinion filed November 15, 2002.

*Patrick H. Dunn*, assistant appellate defender, for appellant.

*Kelly J. McPherron*, legal intern, *Angela M. Wilson*, assistant district attorney, *Christine Kenney*, district attorney, and *Carla J. Stovall*, attorney general, for appellee.

Before GERNON, P.J., GREEN, J., and PADDOCK, S.J.

GREEN, J.: Following a jury trial, Billy Wayne Carter, II, was convicted of fleeing or attempting to elude a law enforcement officer, obstruction of official duty, and battery on a law enforcement officer. Carter was sentenced to 24 months' probation with an underlying prison term of 36 months for the convictions. On appeal, Carter contends that the State violated his Fifth Amendment rights by commenting on his post-*Miranda* silence. In addition, Carter maintains that his conviction for attempting to elude capture under K.S.A. 8-1568(b)(2) was not supported by sufficient evidence. We disagree and affirm.

Just after midnight, on September 30, 2000, Officer Ken Farrar of the Lawrence Police Department was sent to 1951 Miller Drive in Lawrence. The control center told Officer Farrar that a stabbing

had occurred at that address. When Officer Farrar arrived at that location, he was joined by Officer Bruce Elliott, and they both proceeded to speak with the victim of the stabbing, Jason Streeter. Streeter told the officers that Billy Wayne Carter had stabbed him with a pair of scissors. Streeter also gave the officers a description of the car Carter was driving. Officer Farrar then relayed the description of the car to other officers on patrol.

Shortly before 1 a.m., Officer Matthew Weidl saw a car that matched the description given by Officer Farrar. Officer Weidl did a registration check and confirmed the car belonged to Carter. Officer Weidl then told other officers that he would need assistance to conduct a felony car stop. When Officer Sam Harvey and Sergeant Mike Pattrick arrived, the three officers stopped the car. Officer Harvey told the driver of the car to stick his hands out the window into plain sight. The driver initially put his hands out the window, then almost immediately pulled them back in the car. The officer repeated the request for the driver to place his hands outside the window of the car. The driver ignored the request and started to drive the car away.

Officers Weidl and Harvey, who were in full uniform, pursued the car in their fully marked patrol cars with lights and sirens activated. Sergeant Pattrick pursued in his unmarked car. The chase eventually ended at 2200 Harper. The driver left the car and ran toward the front porch of a trailer. At this point, Officer Weidl chased after the driver on foot and tackled him. The driver then got to his feet and a struggle ensued as the officers attempted to restrain the driver. After the officers had the suspect under control, Officer Weidl saw a pair of scissors in the suspect's hands. Officer Weidl used his flashlight to strike the suspect's hand until he released the scissors. All of the officers on the scene identified the suspect as Carter.

Two of the officers received minor injuries in the struggle. Additionally, Carter received injuries and was taken from the scene in an ambulance. Carter testified that while he was at the hospital an officer asked him if he would like to explain his side of the story. Carter testified that he told the officer he had just received a shot from the nurse, and that while he would like to help in any manner

he could, he did not believe it was in his best interest to say anything while he was under the influence of the drugs.

Carter first argues that during recross-examination the State impermissibly commented on his silence. At trial, Carter's sole defense was his credibility. Carter contends that the State's comments on his silence gave the jury the impression that he had no explanation for his actions immediately after the incident, but fabricated a story in the interim. It is constitutionally impermissible for the State to elicit evidence at trial of an accused's post-*Miranda* silence. *Doyle v. Ohio*, 426 U.S. 610, 618, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). Claims that the State has impermissibly commented or questioned about a defendant's post-*Miranda* silence are measured by the harmless error standard. *State v. Fulton*, 28 Kan. App. 2d 815, 820, 23 P.3d 167, *rev. denied* 271 Kan. 1039 (2001). Carter's argument fails in several respects.

First, defense counsel failed to object to the offending line of questioning. Carter concedes this point; however, he argues that this court must reach this issue to serve the interests of justice and prevent a denial of fundamental rights. See *State v. McIver*, 257 Kan. 420, 433, 902 P.2d 982 (1995). This argument is unavailing as Kansas law has made it clear that a question or comment challenged under *Doyle* requires a timely and specific objection to preserve the issue for appeal. K.S.A. 60-404; *State v. Haddock*, 257 Kan. 964, 973, 897 P.2d 152 (1995); *State v. Scott*, 28 Kan. App. 2d 418, 426, 17 P.3d 966 (2001).

Second, defense counsel arguably opened the door to the line of questioning conducted by the State. "A defendant cannot open up an issue at the trial and use unrestricted statements to his or her advantage and then on appeal, after an unfavorable result is obtained, contend the trial court's ruling to be erroneous." *State v. Saleem*, 267 Kan. 100, 109, 977 P.2d 921 (1999).

The State argues that its questioning was simply a response to defense counsel asking Carter if the officers gave him an opportunity to explain his side of the story. Specifically, during redirect examination defense counsel asked:

"Q. [Mr. Branson]. That's not like these officers—they didn't ask you to explain your side of the story at that point in time, did they?

"A. [Billy Carter]. No, never did."

On recross-examination the State asked:

"Q. [Ms. Wilson]. Nobody ever asked you your side of the story?
"A. [Billy Carter]. Later when I was at the hospital an officer did.
"Q. And you didn't want to tell them your side of the story then, did you?
"A. Well, one of them nurse ladies had just given me a shot and I had mentioned to her that it was like all my body was just real relaxed and numb and I explained to the officer that I would be more than happy to cooperate in any way that I could, but because I was under the influence of drugs or whatever that the doctor had just given me that I didn't believe that it was in my best interests to say anything.
"Q. You said you tried—the officers were hurting you at the porch, right?
"A. Yeah.
 . . . .
"Q. They weren't giving you a chance to say, hey, I didn't do anything wrong, at the porch, right?
"A. I don't know that even was an issue. I mean they were just—"

Defense counsel on redirect examination purposely asked Carter if the officers gave him an opportunity to explain his side of the story. Therefore, the later questioning by the State regarding Carter's opportunities to explain his side of the story to the officers was within the scope of the redirect examination.

Third, there is no indication in the record that Carter ever received *Miranda* warnings. Central to *Doyle* is the idea that when the government advises a defendant of his or her *Miranda* rights, it has induced the defendant's silence by impliedly assuring the defendant that his or her silence will not be used against him or her. Thus, it is a violation of due process to allow the government to comment on, or to use for impeachment purposes, silence induced by the *Miranda* warnings. *Doyle*, 426 U.S. at 618. The United States Supreme Court has held, however, that cross-examination of a defendant regarding that defendant's postarrest, but pre-*Miranda*, silence did not violate due process. *Fletcher v. Weir*, 455 U.S. 603, 607, 71 L. Ed. 2d 490, 102 S. Ct. 1309 (1982); *State v. Nott*, 234 Kan. 34, 43-44, 669 P.2d 660 (1983). The appellant bears the burden of furnishing a record which affirmatively shows that prejudicial conduct occurred in the trial court. *State v. Richard*, 252 Kan. 872, 874, 850 P.2d 844 (1993). Carter has not

referred to any portion of the record indicating that his *Miranda* warnings were given.

Additionally, Carter argues that even if *Miranda* warnings were not given, they should have been given. The law in *Fletcher* does not make any such distinction and simply holds that it is appropriate to impeach a defendant with the defendant's postarrest, but pre-*Miranda*, silence. *Fletcher*, 455 U.S. at 607. Accordingly, the protections afforded by *Doyle* never attached.

Fourth, Carter argues that the State's comments regarding his silence were statutorily impermissible because they violated K.S.A. 60-425 and K.S.A. 60-439. Carter does not provide any analysis or authority supporting this argument. Furthermore, analogous case law demonstrates that Carter's argument must fail. In *State v. Searles*, 246 Kan. 567, 574, 793 P.2d 724 (1990), Searles also maintained that the State impermissibly commented on his privilege against self-incrimination in violation of K.S.A. 60-425 and K.S.A. 60-439. Specifically, the State elicited at trial testimony that during an interrogation the police asked Searles if he had committed the murder they were investigating. Testimony was then given that Searles answered the question by stating, " 'I have nothing to say.' " 246 Kan. at 572. Searles argued that by informing the interrogating officers he had nothing to say, he was asserting a constitutional right and was exercising a statutory privilege under K.S.A. 60-425 " 'to refuse to disclose in an action or to a public official . . . any matter that will incriminate such person.' [Citation omitted.]" 246 Kan. at 574. The exercise of the privilege against self-incrimination, as described in K.S.A. 60-425, is protected by K.S.A. 60-439:

"If a privilege is exercised not to testify or to prevent another from testifying, either in the action or with respect to particular matters, or to refuse to disclose or to prevent another from disclosing any matter, the judge and counsel may not comment thereon, no presumption shall arise with respect to the exercise of the privilege, and the trier of fact may not draw any adverse inference therefrom. In those jury cases wherein the right to exercise a privilege, as herein provided, may be misunderstood and unfavorable, inferences drawn by the trier of the fact, or may be impaired in the particular case, the court, at the request of the party exercising the privilege, may instruct the jury in support of such privilege." K.S.A. 60-439.

The *Searles* court stated that K.S.A. 60-439 "is limited to a situation where a comment is made on a privilege in the trial where the privilege is asserted." 246 Kan. at 574. The court then explained there was no error because although "the State did elicit the fact that at one point Searles stated he had nothing to say, the State did not comment on that assertion." 246 Kan. at 574.

In the instant case, the only possible example of Carter exercising a privilege not to incriminate himself was when Carter instructed the officer questioning him at the hospital that he did not wish to answer any questions. This fact, like the fact in *Searles*, was elicited by the State during trial. Also, like the State in *Searles*, the State in the instant case did not make any other comment concerning this fact. Therefore, no violation of K.S.A. 60-425 and K.S.A. 60-439 occurred.

Next, Carter argues that the trial court erred in finding sufficient evidence to support his conviction for fleeing or attempting to elude a police officer under K.S.A. 8-1568(b)(2) as a severity level 9, person felony. "When sufficiency of the evidence is attacked, the standard of review is 'whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted.]" *State v. Zabrinas*, 271 Kan. 422, 441-42, 24 P.3d 77 (2001).

Fleeing or attempting to elude a police officer is defined in K.S.A. 8-1568 as:

"(a) Any driver of a motor vehicle who willfully fails or refuses to bring such driver's vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police vehicle or police bicycle, when given visual or audible signal to bring the vehicle to a stop, shall be guilty as provided in subsection (c)(1), (2) or (3). The signal given by the police officer may be by hand, voice, emergency light or siren. The officer giving such signal shall be in uniform, prominently displaying such officer's badge of office, and the officer's vehicle or bicycle shall be appropriately marked showing it to be an official police vehicle or police bicycle.

"(b) Any driver who violates the provisions of subsection (a) and who:

. . . .

(2) is attempting to elude capture for the commission of any felony, shall be guilty as provided in subsection (c)(4).

. . . .

"[c](4) Every person convicted of violating subsection (b) shall be guilty of a severity level 9, person felony."

Carter was convicted of a severity level 9, person felony, as provided in K.S.A. 8-1568(c)(4). This conviction was based on jury instruction No. 15. That instruction provided:

"The defendant is charged in count four with the crime of fleeing or attempting to elude a police officer. The defendant pleads not guilty. To establish this charge each of the following claims must be proved: One, that the defendant was driving a motor vehicle; and two, that the defendant was given a visual or audible signal by a police officer to bring the motor vehicle to a stop; and three, that the defendant intentionally failed or refused to bring the motor vehicle to a stop, or otherwise fled or attempted to elude a pursuing police officer; and four, that the police officer giving such a signal was in uniform, prominently displaying such officer's badge of office; and five, that the police officer's vehicle was appropriately marked showing it to be an official police vehicle; and six, the defendant attempted to elude capture for aggravated battery; and seven, that this act occurred on or about the 30th day of September, 2000, Douglas County, Kansas."

Carter now argues that element number six of the instruction could not be proven. This contention is based on the fact that the jury acquitted Carter of aggravated battery against Streeter. Therefore, Carter argues that the lack of an underlying felony precludes the application of K.S.A. 8-1568(b)(2) and subsection (c)(4).

Because there is no direct authority that resolves this question relating to K.S.A. 8-1568, we must turn to the obstruction statute, K.S.A. 21-3808, for help. K.S.A. 21-3808, like K.S.A. 8-1568, criminalizes conduct that interferes with the performance of law enforcement. They are both designed to encourage citizens to cooperate with law enforcement and punish those who make the officer's job more difficult and dangerous. Thus, it seems logical to consider case law developed in interpreting K.S.A. 21-3808.

Specifically, K.S.A. 21-3808 states:

"(a) Obstructing legal process or official duty is knowingly and intentionally obstructing, resisting or opposing any person authorized by law to serve process in the service or execution or in the attempt to serve or execute any writ, warrant, process or order of a court, or in the discharge of any official duty.

"(b)(1) Obstructing legal process or official duty in the case of a felony, or resulting from parole or any authorized disposition for a felony, is a severity level 9, nonperson felony.

(2) Obstructing legal process or official duty in a case of misdemeanor, or resulting from any authorized disposition for a misdemeanor, or a civil case is a class A nonperson misdemeanor."

In *State v. Hudson*, 261 Kan. 535, 931 P.2d 679 (1997), the defendant was charged with felony obstruction of official duty. There, the officer turned on his lights and siren when he saw the defendant run a stop sign, and the defendant drove away from him. The defendant eventually abandoned his vehicle and continued his evasion of police on foot until he was apprehended. A later investigation revealed that the defendant's driver's license had been suspended and that there were outstanding felony warrants against him. Based on those felony warrants, the State charged the defendant with the felony offense of obstructing legal process or official duty in violation of K.S.A. 21-3808(a). However, because running a stop sign was a misdemeanor, the trial court reduced the count from a felony to a misdemeanor charge, and the State appealed.

Our Supreme Court held that the term "official duty" under K.S.A. 21-3808(a) was dependent on the officer's knowledge and intent:

"The touchstone for the classification of the offense is the reason for the officer's approaching the defendant who then flees or otherwise resists, and not the status of the defendant. Thus, the trial court correctly held that the classification under K.S.A. 21-3808 depends on what the officer believed his duty to be as he discharged it." 261 Kan. at 538-39.

Because the officer was attempting to stop the defendant for a traffic violation, the obstruction of official duty was a misdemeanor, and the trial court was affirmed.

Applying the *Hudson* holding, we determine that Carter's reason for eluding capture and his actual status were irrelevant and that only the officer's reason for attempting to capture Carter was significant. When the officers were pursuing Carter, they believed he had just committed a felony. Carter was suspected of stabbing another person. Because Officer Weidl requested assistance from other officers to conduct a felony car stop, it was apparent that he intended to arrest Carter for commission of the felony of aggravated battery. Based on Officer Weidl's intent, the requirement of a felony under K.S.A. 8-1568(b)(2) was fulfilled.

Affirmed.