NOT DESIGNATED FOR PUBLICATION

No. 120,985

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LARRY KENNETH APPLEBEE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; MARK S. BRAUN, judge. Opinion filed March 13, 2020.
Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Michael J. Duenes*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., BUSER, J., and BURGESS, S.J.

PER CURIAM: Following a jury trial, Larry Kenneth Applebee was convicted on charges of possession of methamphetamine and unlawful use of drug paraphernalia. Applebee timely appeals his convictions, arguing that the State committed prosecutorial error when it improperly presented evidence of Applebee's post-*Miranda* silence during its case-in-chief and its closing arguments, violating the principles set forth in *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). Finding no error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On September 18, 2017, Topeka Police Officers William Lister and Derek Child stopped Applebee after they observed large cracks in the windshield of Applebee's Chevy Suburban. The officers believed the cracks substantial enough to obstruct Applebee's view while driving. During the stop, Officer Lister engaged Applebee, while Officer Child spoke with the passenger in the front seat of the vehicle. The officers also noticed a large dog in Applebee's car. At Officer Lister's request, Applebee provided Lister with his personal information. Officer Lister returned to his patrol car to run Applebee's information while Officer Child continued speaking with the passenger in the front seat. During this time, Topeka Police Sergeant Daniel Wilson arrived on the scene to supervise the stop.

While checking Applebee's information, Officer Lister learned that Applebee had an active arrest warrant. Officer Lister approached the Suburban again and arrested Applebee. Up to that point, all three officers had looked inside Applebee's vehicle for any signs of illegal items in plain view but uncovered nothing. After Applebee was arrested and removed from the vehicle, Officer Child continued talking to the passenger sitting in the front seat of the Suburban for several minutes. While Officer Child supervised the passenger during much of the stop, at one point he went back to the patrol vehicle to convene with Officers Lister and Wilson, leaving the passenger unattended in the Suburban for approximately two or three minutes.

After having left the passenger unattended, Officer Lister approached the Suburban again and informed the passenger that Applebee's mother would be coming to the scene to pick up the Suburban and the dog. At that time, Officer Lister noticed a small digital scale in the center dash compartment. He asked the passenger to step out of the car with the dog and then began a search of Applebee's vehicle. Officer Lister removed the scale from the center dash compartment and noticed a white residue on it. Officer Lister

2

also found Applebee's wallet on the driver's side floorboard. When the officer searched the wallet, he found a clear plastic baggie containing a white crystalline substance and Applebee's expired identification card. A forensic scientist with the Kansas Bureau of Investigation crime laboratory later determined that the baggie contained 2.17 grams of methamphetamine. Applebee was later charged with possession of methamphetamine, unlawful use of drug paraphernalia, and obstructed view.

After Applebee was arrested and the officers finished searching the vehicle, Applebee's mother, Melissa Applebee-Jaques, arrived at the scene to pick up the car and the dog. When she arrived, the officers and the passenger were still there. After a short period of time, the officers departed, leaving Applebee-Jaques alone with the passenger.

At trial, Applebee-Jaques testified that once the officers left, the passenger got back into Applebee's Suburban, took out Applebee's wallet, and started looking through it. Applebee-Jaques then took the wallet away from the passenger. She further testified that the passenger removed a metal box containing various phone parts from the vehicle and handed it to her, saying that she needed to put the box in her car because the police were looking at it. She believed "there was something off" about the passenger's request, so she stayed with the passenger and Applebee's vehicle.

Applebee-Jaques' husband, Larry Jaques, arrived on scene approximately 45 minutes to an hour later to help Applebee-Jaques with Applebee's vehicle. Jaques also testified at trial, stating he found a "meth pipe" in Applebee's car on the floor behind the driver's seat in plain view, lying on top of some clothes. Jaques stated he threw out the pipe while driving Applebee's car home. There is no evidence in the record that either Applebee-Jacques or Jacques notified the police of the passenger's behavior after the officers left the scene or regarding the pipe Jaques found and neither party contest this issue.

At the jury trial on April 4 and 5, 2018, the State called all three officers to testify. During the State's direct examination of Officer Lister, the prosecutor asked him questions regarding what happened after Applebee was arrested and being transported to the jail. The following line of questioning occurred:

> "Q. [PROSECUTOR] While you were driving to the department of corrections, would you have read *Miranda* to Mr. Applebee?
> "A. [OFFICER LISTER] Yes, I did.
> "Q. And what if anything did he do after you'd read him his rights?
> "A. He stayed quiet, didn't say anything.
> "Q. And when you got to DOC, did you drop him off at that point or what did you do?
> "A. We booked him into DOC, department of corrections."

Defense counsel did not object to this line of questioning. Furthermore, the State never made any additional reference to Applebee's post-*Miranda* silence at trial.

Applebee did not take the stand at trial. Instead, defense counsel offered an alternative theory by cross-examining the State's witnesses and calling Applebee-Jaques and Jaques to testify. Specifically, defense counsel argued that the methamphetamine and the digital scale did not belong to Applebee. Instead, defense counsel theorized that these items belonged to the passenger and that he planted the methamphetamine in Applebee's wallet and the digital scale in the center dash compartment while he was left unattended in the vehicle. Defense counsel argued that Applebee-Jaques' testimony about the passenger's behavior once the officers left and Jaques' testimony about finding a pipe in plain view after officers had already searched Applebee's vehicle provided further proof to support this alternative theory.

Near the end of his closing argument, the prosecutor made the following remark about Applebee-Jaques' and Jaques' testimonies:

4

"And finding the pipe and the assertions that he was going through the wallet after the fact, they don't really make sense either. The reason they don't make sense is because if that's what happened, why didn't they call the police? Their son was just arrested for something that they don't believe he did. Why wouldn't you call police and say, hey, this is what this guy was doing. This is what we also found. [The passenger's] the only person who's been in the car ever since. You guys need to get back down here because he's the one who put it there."

Defense counsel made no objection to these remarks.

Following a brief deliberation, the jury found Applebee guilty of possession of methamphetamine and unlawful use of drug paraphernalia. The jury acquitted Applebee of the obstructed view charge. At sentencing on June 22, 2018, the district court sentenced Applebee to 15 months in prison for the possession of methamphetamine and 6 months in jail for the unlawful use of drug paraphernalia—both sentences running concurrently. The district court suspended the sentences as Applebee was eligible for Senate Bill 123 drug treatment and ordered Applebee to serve an 18-month supervised probation term. Applebee timely appeals his convictions.

## DID THE STATE INTRODUCE EVIDENCE ABOUT APPLEBEE'S POST-*MIRANDA* SILENCE DURING TRIAL AND COMMIT PROSECUTORIAL MISCONDUCT?

*Standard of Review*

In a case where a defendant argues his constitutional rights—as protected by *Doyle*—were violated, this court reviews the claim de novo. *State v. Fisher*, 304 Kan. 242, 248, 373 P.3d 781 (2016). If the court determines there was a *Doyle* error, reversal of a conviction is not automatic. 304 Kan. at 249. Rather, it must then decide whether that error was harmless by examining it in the context of the record as a whole and by considering how the district court handled the error when it arose. The error may be harmless where the party benefitting from it proves beyond a reasonable doubt that the

error complained of did not affect the outcome of the trial in light of the entire record. In other words, the error is harmless if there is no reasonable possibility that it contributed to the verdict. 304 Kan. at 248.

*Discussion*

Applebee argues that the State impermissibly used his post-*Miranda* silence at trial to impeach him on two separate occasions. First, he contends that during the State's case-in-chief, the prosecutor asked Officer Lister what Applebee did after the officer read Applebee his rights. Officer Lister responded that Applebee "stayed quiet" and "didn't say anything." Second, he claims that during the State's closing argument, the prosecutor essentially told the jury that Applebee must be guilty because neither Applebee-Jaques nor Jaques spoke to the police after Applebee's arrest to protest his innocence.

The State responds with three arguments:  (1) Applebee failed to preserve his *Doyle* challenge with a timely and specific objection, (2) no *Doyle* violation occurred, and (3) even if a *Doyle* violation occurred, it did not affect the outcome of the trial.

Generally, the State is not allowed to impeach a defendant using the defendant's post-*Miranda* silence. *Doyle*, 426 U.S. at 619; *Fisher*, 304 Kan. at 248. There are some notable exceptions to this rule. For example, a defendant's silence before *Miranda* warnings are given and a defendant's statements made after the warnings are given are not protected under *Doyle*. *Fisher*, 304 Kan. at 249. Furthermore, *Doyle* protections do not extend to defendants in cases where their witnesses are examined about the witnesses' previous refusals to speak to law enforcement, so long as the witnesses were not previously in custody and given *Miranda* warnings. See *State v. Wilkerson*, 278 Kan. 147, 157, 91 P.3d 1181 (2004) (finding no *Doyle* violation where prosecutor examined a defense alibi witness who previously refused to speak to law enforcement and who had not been in custody or read *Miranda* warnings).

6

If the *Doyle* challenge concerns an evidentiary issue raised at trial—e.g., a prosecutor's line of questioning on direct or cross-examination—a defendant cannot argue the issue on appeal if defendant did not timely and specifically object to it during the trial. See K.S.A. 60-404; *State v. King*, 288 Kan. 333, 348-49, 204 P.3d 585 (2009). However, if the defendant alleges the *Doyle* violation occurred during a prosecutor's opening or closing remarks, this court may consider the alleged violation for the first time on appeal even where there is no objection. See 288 Kan. at 349.

Applebee's first argument that the State impermissibly elicited testimony during its case-in-chief regarding Applebee's post-*Miranda* silence fails because it was not properly preserved for appeal. The Kansas Supreme Court unequivocally held in *King* that *Doyle* issues must be timely and specifically objected to during the evidentiary phase of trial. *King*, 288 Kan. at 348-49. Applebee's counsel failed to object to Officer Lister's testimony regarding Applebee's post-*Miranda* silence. Because of defense counsel's failure to object, this issue is not properly preserved.

Applebee's second argument that the State impermissibly implied to the jury that Applebee must be guilty because neither of his witnesses spoke to the police regarding potentially exculpatory evidence they found following Applebee's arrest also fails. *Doyle* specifically states that the prosecutor cannot impeach a defendant with the defendant's own post-*Miranda* silence. *Doyle*, 426 U.S. at 619; *Fisher*, 304 Kan. at 249. When it comes to defense witnesses, the State may question those witnesses regarding their refusal to speak to law enforcement or reference that silence to show witness bias as long as those witnesses were not in custody and had not been given *Miranda* warnings. See *Wilkerson*, 278 Kan. at 157.

Applebee-Jaques and Jaques testified on Applebee's behalf. Neither had been arrested or given *Miranda* warnings. Both individuals failed to contact law enforcement after Applebee's arrest to inform the police about potentially exculpatory evidence. This

silence is in no way related to Applebee's right to post-*Miranda* silence and the witnesses were afforded no right to silence since they were neither in custody nor been given *Miranda* warnings. Consequently, the prosecutor is allowed to examine these witnesses regarding their silence or reference that silence to highlight any potential bias. See *Wilkerson*, 278 Kan. at 157. There is no *Doyle* error as to the comment on the testimony of Jaques and Applebee-Jaques.

Affirmed.